UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DARRYL ROBINSON** | **CIVIL ACTION** |
| **versus** | **NO. 13-5802** |
| **WARDEN ROBERT TANNER** | **SECTION: "E" (3)** |

### REPORT AND RECOMMENDATION

    This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE** as untimely.

    Petitioner, Darryl Robinson, is a state prisoner incarcerated at the B.B. "Sixty" Rayburn Correctional Center, Angie, Louisiana. On September 21, 1995, he was convicted of attempted second degree murder.[1] On October 27, 1995, he was sentenced to a term of forty years imprisonment without benefit of parole, probation, or suspension of sentence.[2] On July 30, 1997,

---

 [1] State Rec., Vol. IV of VI, transcript of September 21, 1995, p. 154; State Rec., Vol. IV of VI, minute entry dated September 21, 1995; State Rec., Vol. IV of VI, jury verdict form.

 [2] State Rec., Vol. IV of VI, minute entry dated October 27, 1995; State Rec., Vol. IV of VI, transcript of October 27, 1995.

the Louisiana Fourth Circuit Court of Appeal affirmed his conviction, vacated his sentence, and remanded the matter for resentencing.[3]  On October 3, 1997, he was resentenced to a term of forty years imprisonment, with the first five years of that sentence to be served without benefit of parole, probation, or suspension of sentence.[4]  On February 10, 1999, the Louisiana Fourth Circuit Court of Appeal affirmed that sentence,[5] and he did not seek review of that judgment by the Louisiana Supreme Court.  As explained below, he thereafter sought no further relief until 2002, at which time he began filing post-conviction applications and motions intermittently in the state courts, continuing such efforts until finally seeking federal relief in 2013.

Petitioner filed his first state post-conviction application on February 5, 2002.[6]  The state district court denied that application on March 11, 2002.[7]  On an unknown date thereafter, he

---

[3] State v. Robinson, No. 96-KA-1056 (La. App. 4th Cir. July 30, 1997); State Rec., Vol. IV of VI.

[4] State Rec., Vol. V of VI, resentencing transcript; State Rec., Vol. V of VI, minute entry dated October 3, 1997.

[5] State v. Robinson, No. 98-KA-1409 (La. App. 4th Cir. Feb. 10, 1999); State Rec., Vol. V of VI.

[6] State Rec., Vol. I of VI.  Federal *habeas* courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006).  Because that date cannot be gleaned from the state court record with respect to the filings in this case, this Court will simply use the signature date of the applications and motions as the filing date, in that the various filings were obviously placed in the mail no earlier than the date they were signed.  In those instances where no signature date appears on a document and no other evidence is available, the Court will look to the file-stamp placed on the document by the clerk of court. While these assumptions are somewhat imprecise, approximate filing dates are sufficient here because petitioner's federal application is untimely by more than a decade.

[7] State Rec., Vol. I of VI, Judgment dated March 11, 2002.

also filed with that court a motion to amend or modify his sentence, which was denied on February 10, 2003,[8] a motion for reconsideration of sentence, which was denied on April 28, 2003,[9] and a motion for modification of sentence, which was denied on June 4, 2003.[10]

Years later, petitioner then returned to the state district court to file a motion for clarification of sentence, which was denied on April 20, 2009,[11] and a motion to amend or clarify sentence, which was denied on August 12, 2009.[12] Thereafter, he filed a motion to correct an illegal sentence on November 10, 2009. That motion was also denied by the state district court on December 9, 2009,[13] and his related writ applications were likewise denied by the Louisiana Fourth Circuit Court of Appeal on February 5, 2010,[14] and by the Louisiana Supreme Court on March 4, 2011.[15] In the interim, he filed with the state district court a motion to reconsider sentence, which was denied on January 8, 2010,[16] and another motion to correct an illegal sentence, which was

---

[8] State Rec., Vol. I of VI, Judgment dated February 10, 2003.

[9] State Rec., Vol. I of VI, minute entry dated April 28, 2003.

[10] State Rec., Vol. I of VI, Judgment dated June 4, 2003.

[11] State Rec., Vol. I of VI, Docket Master entry dated April 20, 2009.

[12] State Rec., Vol. I of VI, Judgment dated August 12, 2009.

[13] State Rec., Vol. I of VI, Judgment dated December 9, 2009.

[14] State v. Robinson, No. 2010-K-0034 (La. App. 4th Cir. Feb. 5, 2010); State Rec., Vol. VI of VI.

[15] State ex rel. Robinson v. State, 58 So.3d 465 (La. 2011) (No. 2010-KH-0544).

[16] State Rec., Vol. I of VI, Docket Master entry dated January 8, 2010.

denied on September 24, 2010,[17] as well as a related writ application, which was then similarly denied by the Louisiana Fourth Circuit Court of Appeal on November 8, 2010.[18]

On November 16, 2011, petitioner filed another post-conviction application, which was denied by the state district court on November 29, 2011,[19] and his related writ applications were then also denied by the Louisiana Fourth Circuit Court of Appeal on March 27, 2012,[20] and by the Louisiana Supreme Court on September 14, 2012.[21] In the interim, he filed yet another motion to correct an illegal sentence, which was denied by the state district court on April 5, 2012,[22] and his related writ applications were likewise denied by the Louisiana Fourth Circuit Court of Appeal on May 16, 2012,[23] and May 30, 2012.[24] He also filed another motion to amend or modify his sentence,

---

[17] State Rec., Vol. VI of VI, Judgment dated September 24, 2010.

[18] State v. Robinson, No. 2010-K-1499 (La. App. 4th Cir. Nov. 8, 2010); State Rec., Vol. VI of VI.

[19] State Rec., Vol. I of VI, Docket Master entry dated November 29, 2011.

[20] State v. Robinson, No. 2012-K-0401 (La. App. 4th Cir. Mar. 27, 2012); State Rec., Vol. VI of VI.

[21] State ex rel. Robinson v. State, 97 So.3d 384 (La. 2012) (No. 2012-KH-0955); State Rec., Vol. VI of VI.

[22] State Rec., Vol. VI of VI, Judgment dated April 5, 2012.

[23] State v. Robinson, No. 2012-K-0682 (La. App. 4th Cir. May 16, 2012); State Rec., Vol. VI of VI.

[24] State v. Robinson, No. 2012-K-0761 (La. App. 4th Cir. May 30, 2012); State Rec., Vol. VI of VI.

which was denied by the state district court on October 16, 2012,[25] and another motion to correct an illegal sentence, which was denied on October 24, 2013.[26]

Meanwhile, petitioner filed the instant federal application seeking *habeas corpus* relief on September 8, 2013.[27] The state argues that the federal application is untimely.[28]

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a one-year statute of limitations for the filing of federal *habeas corpus* applications. The method for calculating a petitioner's one-year period is set forth in 28 U.S.C. § 2244(d), which provides:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
>
> >(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> >(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

---

[25] State Rec., Vol. I of VI, Docket Master entry dated October 16, 2012.

[26] State Rec., Vol. I of VI, Docket Master entry dated October 24, 2013.

[27] Rec. Doc. 5.

[28] Rec. Doc. 15.

The state argues that Subsection A applies in the instant case.  As noted, under that subsection, a petitioner must bring his § 2254 claims within one (1) year of the date on which his underlying criminal judgment became "final."  On that point, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).  When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court.  Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).  However, "[i]f the defendant stops the appeal process before that point," ... "the conviction becomes final when the time for seeking further direct review in the state court expires."  Id. at 694; see also Foreman v. Dretke, 383 F.3d 336, 338 (5th Cir. 2004) (Section 2244(d)(1)(A) gives alternative routes for finalizing a conviction: either direct review is completed or the time to pursue direct review expires).
> Although federal, not state, law determines when a judgment is final for federal habeas purposes, a necessary part of the finality inquiry is determining whether the petitioner is still able to seek further direct review.  See Foreman, 383 F.3d at 338-39.  As a result, this court looks to state law in determining how long a prisoner has to file a direct appeal.  See Causey v. Cain, 450 F.3d 601, 606 (5th Cir. 2006); Roberts, 319 F.3d at 693.

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008).

However, under the AEDPA, a state criminal judgment is not final until *both* the petitioner's conviction *and* sentence are final.  See Burton v. Stewart, 549 U.S. 147, 156-57 (2007); Scott v. Hubert, 635 F.3d 659, 665-67 (5th Cir. 2011).  As noted, after petitioner's original sentence

was vacated on direct appeal, he was resentenced by the state district court on October 3, 1997,[29] and the Louisiana Fourth Circuit Court of Appeal affirmed that sentence on February 10, 1999.[30] Therefore, his state criminal judgment became final on March 12, 1999, when his period expired for seeking further direct review by filing a writ application with the Louisiana Supreme Court. See Louisiana Supreme Court Rule X, § 5(a). Accordingly, his federal limitations period commenced on that date and then expired one year later on March 13, 2000,[31] unless that period was extended by tolling.

The Court first considers statutory tolling. Regarding the statute of limitations, the AEDPA expressly provides: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

---

[29] State Rec., Vol. V of VI, resentencing transcript; State Rec., Vol. V of VI, minute entry dated October 3, 1997.

[30] State v. Robinson, No. 98-KA-1409 (La. App. 4th Cir. Feb. 10, 1999); State Rec., Vol. V of VI.

[31] The Court is aware that, because the year 2000 was a leap year, the three-hundred-sixty-fifth day of petitioner's one-year period was March 11, 2000. However, courts have held that it is the "anniversary date" on which the AEDPA's statute of limitations expires, regardless of the existence of an additional day due to a leap year. See, e.g., United States v. Hurst, 322 F.3d 1256, 1261-62 (10th Cir. 2003); United States v. Marcello, 212 F.3d 1005, 1010 (7th Cir. 2000); Zeno v. Louisiana, Civ. Action No. 06-4096, 2009 WL 3190461, at *3 n.17 (E.D. La. Sept. 30, 2009). Moreover, because the "anniversary date" of March 12, 2000, fell on a Sunday, the federal limitations period was extended through the following Monday, March 13, 2000. See Flanagan v. Johnson, 154 F.3d 196, 202 (5th Cir. 1998) ("We hold that [Fed.R.Civ.P.] 6(a) applies to the computation of the one year limitation period in § 2244(d) of AEDPA."); Fed.R.Civ.P. 6(a) (if the last day of an applicable period is a Saturday, a Sunday, a legal holiday, or a day when the clerk's office is inaccessible, the period runs until the end of the next day that is not one of those days).

However, petitioner had no such applications pending before the state courts during the applicable one-year period.[32]

The Court must next consider equitable tolling. The United States Supreme Court has expressly held that the AEDPA's statute of limitations is subject to equitable tolling. Holland v. Florida, 560 U.S. 631, 645 (2010). However, "a petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Id. at 649 (internal quotation marks omitted); see also Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances"). Petitioner bears the burden of proof to establish entitlement to equitable tolling. Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002). In the instant case, petitioner has brought forth no evidence demonstrating that he is entitled to such tolling, and this Court knows of no reason that would support equitable tolling of the statute of limitations.

Because petitioner is not entitled to statutory tolling, and because he has not established that he is eligible for equitable tolling, his federal application for *habeas corpus* relief would be timely under Subsection A only if it was filed on or before March 13, 2000. His federal

---

[32] It is, of course, true that petitioner filed numerous state post-conviction applications and motions beginning on February 5, 2002. However, because those applications and motions were filed *after* the expiration of the federal statute of limitations, they had no bearing on the timeliness of his federal application. See Scott v. Johnson, 227 F.3d 260, 263 (5th Cir. 2000); Magee v. Cain, Civ. Action No. 99-3867, 2000 WL 1023423, at *4, aff'd, 253 F.3d 702 (5th Cir. 2001); Williams v. Cain, Civ. Action No. 00-536, 2000 WL 863132, at *2 (E.D. La. June 27, 2000). Simply put, once the federal limitations period expired, "[t]here was nothing to toll." Butler, 533 F.3d at 318.

application was not filed until September 8, 2013, and, therefore, it is untimely under Subsection A.

That said, petitioner appears to be contending that Subsection A is inapplicable because he is asserting a claim that newly discovered evidence establishes that he is actually innocent. The Court will broadly construe that contention as an argument that Subsection D applies.

As noted, Subsection D delays the commencement of the AEDPA's statute of limitations until "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." Here, petitioner contends that, prior to his arrest, the police had advised all persons named "Darryl Robinson" in the uptown and downtown areas of New Orleans to report to a police station for questioning regarding this crime. He reported as advised, was questioned for approximately ten minutes, and his height and weight were recorded. An Officer Hockman allegedly then made the following notation on a piece of paper: "To any 26, this is not the correct Darryl Robinson that 10-60W for a 345 in the Fourth District. This was checked by Lt. Johnson."[33] Petitioner contends that he did not obtain a copy of that document, which serves as the factual predicate of his actual innocence claim, until 2011.[34] Nevertheless, his argument that his federal application is timely due to his belated discovery of the document is unavailing for two reasons.

---

[33] Petitioner indicated that he was attaching a copy of that document to his federal application; however, so such document was attached.

[34] See Rec. Doc. 5, pp. 29-30.

First, and most importantly, a claim of actual innocence based on newly discovered evidence simply does not state a ground for federal *habeas* relief absent an independent constitutional violation occurring in the underlying state criminal proceedings. See, e.g., Reed v. Stephens, 739 F.3d 753, 766 (5th Cir. 2014); Coleman v. Thaler, 716 F.3d 895, 908 (5th Cir. 2013), cert. denied, 134 S. Ct. 1306 (2014). Because that underlying claim is not cognizable, the belated discovery of such evidence does not trigger the provisions of Subsection D. Ulfers v. Cain, Civ. Action No. 12-2087, 2012 WL 5830579, at *3 n.14 (E.D. La. Oct. 25, 2012), adopted, 2012 WL 5830578 (E.D. La. Nov. 16, 2012); Hammack v. Quarterman, No. 4:06-CV-111, 2006 WL 1831329, at *3 (N.D. Tex. June 30, 2006); Pruett v. Cockrell, No. 4-99-CV-781, 2001 WL 1516735, at *9 (N.D. Tex. Nov. 21, 2001); see also Madison v. Scott, No. 3:11CV243, 2012 WL 930932, at *2 (S.D. Miss. Mar. 19, 2012); Ware v. Secretary, Department of Corrections, No. 8:11-cv-418, 2011 WL 5525359, at *6 (M.D. Fla. Nov. 14, 2011) ("Since a free-standing claim of actual innocence is not a cognizable claim, [a prisoner] is not entitled to employ such a claim to reset his time clock under § 2244(d)(1)(D)."); Tate v. Parker, No. 4:06CV99, 2010 WL 2606045, at *2-3 (S.D. Miss. June 22, 2010), aff'd, 439 Fed. App'x 375 (5th Cir. 2011); Morales v. McNeil, No. 09-21335-CIV, 2010 WL 2976552, at *4 (S.D. Fla. June 14, 2010) ("[T]o the extent that any or all of the affidavit testimony is being offered in support of the petitioner's claim that he is entitled to habeas relief on the basis of newly discovered evidence of his innocence, the petitioner would not be entitled to tolling under § 2244(d)(1)(D), because this evidence suggesting his innocence is actually the claim itself, rather than the factual predicate of an independent claim. Because claims of actual innocence based on newly discovered evidence do not state a ground for federal habeas relief absent an

independent constitutional violation, the petitioner would not be entitled to tolling under § 2244(d)(1)(D)."), adopted, 2010 WL 2976550 (S.D. Fla. July 20, 2010); Green v. Stevenson, No. 6:08-4152, 2009 WL 3562297, at *6 (D.S.C. Oct. 30, 2009).

Second, in any event, the fact that petitioner did not actually discover the document until 2011 is of no moment for the purposes of Subsection D. As noted, under that subsection, the commencement of the limitations period is delayed only until the date on which a factual predicate "could have been discovered through the exercise of due diligence," not the date on which it was in fact discovered. Here, for the following reasons, petitioner could have discovered this factual predicate many years earlier.

Under the Louisiana Public Records Law, police department records are subject to disclosure as a public record once the underlying criminal litigation is "finally adjudicated or otherwise settled." La.Rev.Stat.Ann. § 44:3(A)(1). "In the context of § 3(A)(1), instituted criminal litigation is 'finally adjudicated' when the conviction becomes final ([La.C.Crim.P.] Art. 922) or is 'otherwise settled' either by dismissal or by nolle prosse of the formal accusation of the DA." Harrison v. Norris, 569 So.2d 585, 589 (La. App. 2d Cir. 1990) (emphasis omitted); see also Wallace v. Ware, 657 So.2d 734, 737 (La. App. 1st Cir. 1995) ("[A] criminal defendant cannot be denied access to his criminal files after his conviction becomes final."). The possibility that a convicted person may still seek post-conviction relief has no effect on § 3(A)(1). "Post conviction relief ... is not 'criminal litigation' within the meaning of the Public Records Act." Lemmon v. Connick, 590 So.2d 574, 575 (La. 1991) (per curiam).

Therefore, *at the latest*, petitioner could have used the Public Records Act to obtain the document from the police department as soon as his conviction and sentence became final on direct appeal in 1999, and so it is *at that point* that his limitations period would have commenced if Subsection D were applicable. See Ballay v. Louisiana, Civ. Action No. 06-10699, 2007 WL 4413990, at *4-5 (E.D. La. Dec. 13, 2007); Heard v. Cain, Civ. Action No. 06-3207, 2007 WL 763691, at *3 (E.D. La. Mar. 9, 2007).[35] As a result, Subsection D gains petitioner no additional delay of the commencement date than already otherwise provided under Subsection A. See Hunter v. Cain, Civ. Action No. 11-670, 2011 WL 5024355, at *4 (E.D. La. Sept. 23, 2011), adopted, 2011 WL 5023908 (E.D. La. Oct. 20, 2011). Accordingly, even if § 2244(d)(1)(D) were applicable, petitioner's federal application would still be untimely for the reasons previously explained.

Moreover, while the commencement of the federal limitations period is also delayed in those circumstances set forth in Subsections B and C of 28 U.S.C. § 2244(d)(1), those alternative provisions are inapplicable here. Subsection B does not apply because there was no state action in violation of the Constitution or laws of the United States which prevented petitioner from timely filing his federal *habeas corpus* petition, and Subsection C does not apply because his claims are not based on a newly recognized constitutional right.

---

[35] The Court notes that prisoners are routinely denied the benefits of Subsection D for failure to timely utilize the Public Records Act. See Hunter v. Cain, Civ. Action No. 11-670, 2011 WL 5024355, at *3-4 (E.D. La. Sept. 23, 2011), adopted, 2011 WL 5023908 (E.D. La. Oct. 20, 2011); Diggins v. Cain, Civ. Action No. 06-6263, 2008 WL 4889801, at *3 (E.D. La. Oct. 22, 2008), adopted, 2008 WL 4909887 (E.D. La. Nov. 12, 2008); Ballay, 2007 WL 4413990, at *4-5; Heard, 2007 WL 763691, at *3.

Lastly, as noted, petitioner argues that he is actually innocent. It is true that the United States Supreme Court recently held: "[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar ... or, as in this case, expiration of the statute of limitations." McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013). However, the Supreme Court took care to note: "We caution ... that tenable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" McQuiggin, 133 S. Ct. at 1928 (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)). As the United States Sixth Circuit Court of Appeals has explained:

> To assess that question, a court must survey "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." House v. Bell, 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006) (internal quotation marks omitted). With "all the evidence" thus in mind, the court's final task is "to assess the likely impact of the evidence on reasonable jurors"; it is not to work through an "independent factual determination" to divine "what likely occurred." Id. (internal quotation marks omitted).

Eberle v. Warden, Mansfield Correctional Institution, 532 Fed. App'x 605, 613 (6th Cir. 2013).

A logical starting point, therefore, is to look at the "old" evidence, i.e. the evidence presented at trial and on which petitioner's conviction is based. That evidence is recounted in the Louisiana Fourth Circuit Court of Appeal's summary of the facts of this case on the first direct appeal:

> At trial Edwin Joseph, Sr., father of the victim and a teacher and coach at Fortier Senior High School, testified that he first knew the defendant because Robinson played football for Booker T. Washington School. Then when Edwin Joseph, Jr., went to Southern

University, he took Robinson to meet his father.  Joseph, Sr., said he had seen his son in the company of Robinson four or five times.  The young men became friends when they both played ball for Southern University.  Joseph, Sr. told of an incident that happened in the spring of 1994.  While he was teaching a math class, Darryl Robinson knocked on his classroom door.  Robinson interrupted Joseph's class to tell Joseph that he had been robbed of a medallion, shoes, money and a car.  Robinson thought that Edwin Joseph, Jr., had something to do with the robbery.  Joseph, Sr., had Robinson telephone his son right then because he "wanted to nip this in the bud," and he was confident his son was not involved in a robbery.  About a month later, Robinson went to the home of Joseph, Sr., and repeated the same story.  While Robinson was there, Edwin Joseph, Jr., arrived and the two young men talked for a half hour.  Joseph, Sr., called Robinson's former high school football coach, Coach Mallet, to ask for help with Robinson.  Coach Mallet spoke with Robinson twice reiterating the fact that Edwin Joseph, Jr., was not a robber.

      Edwin Joseph, Jr., a third year student at Southern University, lived with his mother at 1 Westpark Court in Algiers when he was in high school.  He was shot only a few blocks from there.  Joseph, Jr. said he met Robinson the fall semester of 1993; Robinson did not return in 1994 and during spring break, Joseph, Jr. became aware that Robinson blamed him for a robbery.  Joseph, Jr. said when spoke to Robinson on the telephone, Robinson told him to find out where Robinson's car was before 3 p.m. that day.  Joseph, Jr. said he was shocked that Robinson would think he had something to do with robbing him, and he tried to explain that to Robinson.  However, Robinson called him back several times that afternoon to repeat the threat.  About a week later, Joseph, Jr. went to his father's house and found his father and Robinson sitting on the front porch.  He asked Robinson if Robinson still believed that he had a part in Robinson's being robbed, and Robinson answered, "Yeah."  Yet after they spoke a few minutes longer, Robinson said, "I don't think you had something to do [with] it."  Two weeks later Joseph, Jr., saw Robinson on the campus at Southern University; Robinson was carrying books as though he were a student, but he was not a student then.  Joseph, Jr. did not speak to Robinson at that time.  On Saturday, February 25, 1995, Joseph, Jr. who had returned to New Orleans for Mardi Gras, went to an afternoon parade on the west bank with four friends.  After the parade, the men were standing in the driveway of one man's house when Joseph, Jr. saw two girls he knew. He walked to the corner of Lawrence and Southlawn Streets and

- 14 -

spoke with them until he noticed a frightened look on their faces. He turned around to see Darryl Robinson holding a twelve-gauge semiautomatic shotgun known as a "street-sweeper." Joseph, Jr. said he was so surprised that he did not move until after two shots had been fired, and then he tried to run but a bullet hit his foot. After he fell, Robinson walked over to him, straddled his legs, and fired four or five more times. Joseph, Jr. was hit seven times, in his legs and back. Robinson then got into his car, pulled up next to the prone Joseph and said "Bitch, you tell anybody who did it and I'm going to kill you." Joseph, Jr. was in the hospital for one month.

There was testimony from several of the people with Joseph, Jr., at the time of the shooting. Brent Barrington, a student at Southern University, came to New Orleans to visit Joseph, Jr. during Mardi Gras. After a parade, he and Joseph, Jr. were standing in a driveway when Joseph, Jr. left to speak to two girls. A blue Delta 88 stopped near Joseph, Jr.; a man holding a gun got out of the car and fired two shots. At that point Barrington ran into the house. He heard four more shots and someone screaming. After the firing stopped, Barrington went outside to find his friend had been shot.

Julia Parker and Gizelle Matthews testified that they spoke briefly with Edwin Joseph, Jr., on February 25, 1995, when gunshots ran [sic] out and they hurried away.

Michael Adams testified he was driving a cab on February 25, 1995, and as he dropped a customer off at a corner of Lawrence and Murl Streets, he looked in his rear view mirror to see a man with a shotgun coming down the street. Adams then heard two shots and saw a man fall to the ground; he did not know if the man had been hit or if he tripped. The gunman then stood over the fallen man and kept shooting. Adams radioed his dispatcher to call the police department and an ambulance. In the courtroom Adams identified the defendant as the man he saw shoot Edwin Joseph, Jr.

Officer Anthony Thompson investigated the incident. He spoke to the victim and his father at Charity Hospital. The officer obtained the suspect's name, address, social security number and date of birth. He prepared a warrant for the arrest of the defendant.

Dr. Florence Lewis, an expert in the field of trauma surgery, treated Edwin Joseph at Charity Hospital on February 25, 1995. Dr. Lewis said that Joseph had a shotgun wound to the right thigh, another to the left thigh, one to the front of the lower leg and one to the left heel; he also had a "scattering of pellets" over his back and buttocks. The doctor said the pellets across his back could cause a spilling of the contents of the colon into the abdomen; such injury is

- 15 -

> life-threatening as is an injury to the large arteries in the legs. She operated on Joseph to look for additional injury in the abdomen area, to remove tissue that had been devitalized and to remove shotgun pellets. She said she could not remove all the pellets. She also noted that the muscle loss in his legs was severe.
>
> Darryl Robinson, the twenty-two year old defendant, testified that he knew Edwin Joseph, Jr., from playing football at Southern University. Robinson gave Joseph a ride from Baton Rouge to New Orleans on three occasions. He stopped to speak to Edwin Joseph, Sr. at those times. Robinson admitted going to the classroom of Joseph, Sr., but denied threatening Joseph, Jr., or discussing a stolen car. Robinson said he never spoke to either of the Josephs about a robbery. He also stated that he did not own a gun and that he had no arrests or convictions. When he was informed that he was wanted for a crime, he contacted the police, he said; however, Robinson denied knowing anything about the shooting of Edwin Joseph, Jr.[36]

The foregoing evidence is obviously compelling evidence of guilt. The only new evidence petitioner suggests that he now has to support his claim of actual innocence is the alleged notation by Officer Hockman documenting his conclusion that, based on a ten-minute interview and petitioner's height and weight, the person before him was "not the correct Darryl Robinson that 10-60W for a 345 in the Fourth District." Even if the Court assumes that the person before Hockman was in fact petitioner and that the reference is to the instant crime, neither of which is clear, that evidence pales in comparison to the eyewitness identification of petitioner at trial by both the victim and Michael Adams. Therefore, petitioner has not made the required showing that, in light of new evidence, "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." McQuiggin, 133 S. Ct. at 1928.

---

[36] State v. Robinson, No. 96-KA-1056, at pp. 1-4 (La. App. 4th Cir. July 30, 1997); State Rec., Vol. IV of VI.

For all of the foregoing reasons, it is clear that petitioner's deadline for seeking federal *habeas corpus* relief was no later than March 13, 2000. Because the instant federal application was not filed until September 8, 2013,[37] it is untimely.

### RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Darryl Robinson be **DISMISSED WITH PREJUDICE** as untimely.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[38]

New Orleans, Louisiana, this fourteenth day of July, 2014.

*[signature]*

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[37] "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003). Petitioner states that he placed his federal application in the prison mailing system on September 8, 2013. Rec. Doc. 5, p. 26.

[38] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.

- 17 -